# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 8, 2016 Session

## STATE OF TENNESSEE v. DONALD PEDEN

**Appeal from the Criminal Court for Davidson County**
**No. 2013A134     Mark J. Fishburn, Judge**

---

**No. M2015-01252-CCA-R3-CD – Filed September 19, 2016**

---

This case arises from the attempted murder of Latoya Pipkins in September of 2012. For this offense, the Defendant-Appellant, Donald Peden, was indicted by the Davidson County Grand Jury for attempted first degree murder in count one, especially aggravated robbery in count two, and theft of property valued at more than five hundred dollars, but less than one thousand dollars, in count three. Prior to trial, Peden filed a motion in limine to exclude evidence recovered from a vehicle that he and the victim jointly owned. He also asked the court to exclude photographs of his hands as well as clothing that was taken by investigating officers while he was incarcerated. Following a trial, the State withdrew count three, and the jury convicted Peden of attempted first degree murder in count one and the lesser-included offense of theft of property in count two. The trial court sentenced Peden to eleven months and twenty nine days' incarceration on count two, and after a separate sentencing hearing, sentenced Peden as a Range III career offender to sixty years' incarceration on count one. On appeal, Peden argues that (1) the evidence is insufficient to support his attempted first degree murder conviction; (2) the trial court erred in denying his motions to suppress evidence seized in violation of his Fourth, Fifth, and Sixth Amendment rights; and (3) improperly sentenced him as a Range III, career offender. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and D. KELLY THOMAS, JR., J., joined.

Will Conway (at trial) and Manuel Benjamin Russ (on appeal), Nashville, Tennessee, for the Defendant-Appellant, Donald Peden.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Glenn R. Funk, District Attorney General; Brian Ewald and Katrin Miller, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

**Motion in Limine.** Prior to trial, Peden filed a motion to suppress evidence taken from him while he was incarcerated in Giles County. The specific items at issue were a sock he was wearing when taken into custody, photographs of his hands, and a DNA swab of dried blood on his right thumb. In his motion, Peden argued that the State's collection of these evidentiary items violated his rights under the United States and Tennessee Constitutions.

At the suppression hearing, Detective Adam Weeks of the Metro Nashville Police Department testified that he received a call between 6:00 and 7:00 a.m. on September 20, 2012, regarding a potential homicide. Upon his arrival at the crime scene, he learned that the victim had already been transported to the Vanderbilt University Hospital, and he observed a "significant amount of blood and some other bodily fluids" in the living room and along the carpet and that there were "some bloody tracks" leading to the front door. He also discovered a bloodstained kitchen knife, as well as a "very small sledgehammer" in the living room along with the victim's diary. The victim's two children were also on the scene, and after speaking with them, Detective Weeks learned that the victim's white Mercury Sable had been parked outside the night before but was missing the following morning. Detective Weeks also learned that the victim's boyfriend, Donald Peden, lived in the home, but the victim's children had not seen him at home the night before.

Detective Weeks conducted a background check on Peden and discovered that he had relatives in Giles County. He, along with Detective Donnell Barr, then traveled to Giles County in an effort to locate Peden. Before arriving, Detective Weeks made a courtesy call to the Giles County Sheriff's Department and was told that Peden had been arrested earlier that morning on suspicion of driving under the influence (DUI) after being involved in an accident in a white Mercury Sable.

Detective Weeks testified that when he and Detective Barr approached Peden's jail cell, Peden was alone, still wearing civilian clothes, with his feet propped up on a concrete bench revealing a blood stain on the bottom sole of both socks. Detective Weeks explained that this observation was significant in light of the amount of blood at the crime scene and the presence of "smear marks and track marks" that he believed were made by someone leaving the scene. After advising Peden of his Miranda rights, Detective Weeks began questioning him about the night before. Shortly thereafter, Detective Weeks noticed what appeared to be a dried bloodstain just under the nail of Peden's right thumb. When he attempted to question Peden about the bloodstains, Peden invoked his right to counsel and the questioning ceased.

After Peden invoked his Miranda rights, Detective Weeks informed him that he intended to photograph the front and back of Peden's hands and his sock. The audio of the interview, admitted as an exhibit at the hearing, does not capture Peden's response to these demands. However, Detective Weeks demanded to see Peden's hands at least six times before Peden relented. Shortly thereafter, Detective Weeks asked to photograph the bottom of Peden's sock, at which point Peden responded, "this [is] your crime scene," before throwing the sock at Detective Weeks. After the interview with Peden, Detective Weeks testified that the white Mercury Sable was towed to a police lot in Davidson County, at which point a search warrant was obtained and the vehicle was searched.

Detective Barr testified that he worked with Detective Weeks during the course of his investigation and was present for the interview with Peden. Regarding the interview with Peden, Detective Barr testified that the first thing he noticed when he entered Peden's cell was the blood on the bottom of Peden's sock. "I mean, [the blood] was clear[] as soon as you walked in, that was the first exact thing I noticed, [] it was almost kind of glaring." Detective Barr was also responsible for procuring the search warrant for Peden's vehicle. He recalled that he first conducted a cursory inspection of the outside of the vehicle on September 20, 2012, and the next day he had the car towed to an impound lot in Davidson County and obtained a search warrant.

Trooper William Alvarez of the Tennessee Highway Patrol encountered Peden at approximately 12:30 p.m. on September 20, 2012. He testified that he received a "be on the lookout" ("BOLO") for a vehicle being driven recklessly and traveling north on Highway 65 towards Tennessee from Alabama. Trooper Alvarez located the white Mercury Sable shortly thereafter and testified that it appeared to have just been in an accident when he arrived. As he approached the scene, a bystander informed him that the driver had been seen urinating into a beer can. He identified the driver as Donald Peden and immediately noticed a strong odor of alcohol, as well as an open container of beer in the cup-holder and numerous empty beer cans inside the vehicle. He noted that Peden appeared to have urinated on himself. After failing standardized field sobriety tests, Peden was placed under arrest for DUI.

On cross-examination, Trooper Alvarez stated that Peden did not appear to be injured in the accident. Trooper Alvarez was unaware that Peden was sought in connection to an attempted homicide in Davidson County at the time of the arrest. Once his investigation into the DUI was complete, the vehicle was towed to a private lot.

At the conclusion of the hearing, the trial court took the matter under advisement and issued a written order denying Peden's motion in its entirety on November 3, 2014.

**Jury Trial.** B.P.,[1] the victim's oldest daughter, age fourteen at the time of trial, testified that in September of 2012, she lived with her mother, her younger sister, and Peden, who she referred to as her "step-dad" even though he was not married to the victim. On September 20, 2012, she set the alarm and locked the front door of her house as she did every night before going to bed, and because Peden was not home, her younger sister slept in the victim's room. The following morning, B.P. woke early after hearing something fall in the bathroom. She went to the bathroom and found the victim unconscious in the floor and "bleeding everywhere". She then woke her sister, who was still asleep in the victim's bed, and called the police. Regarding the scene, she recalled that the front door, which she had locked the night before, was unlocked the following morning, and the alarm system had been disarmed. She stated that she did not see Peden, or anyone else, come to the house at any time on the night of September 20, 2012. Additionally, she testified that the victim and Peden shared two cars: a gray one that was usually driven by Peden, and a white one that was usually driven by the victim. The white car was missing the following morning.

L.P., the victim's youngest daughter, age eleven at the time of trial, testified that on the night of September 20, 2012, she was allowed to sleep in the victim's bed because Peden was not home. She did not hear the victim get up during the night and did not wake up until her sister woke her the following morning. She recalled that the house had been locked and the alarm set when she went to bed, but the front door was unlocked and the alarm turned off the following morning. The white car, which the victim usually drove, was also missing.

Tony Hayes Jr., a paramedic with the Nashville Fire Department, arrived on the scene just after 6:30 a.m. and immediately observed a tremendous amount of blood throughout the living room and bathroom. Upon entering the bathroom he found the victim lying face-down with an apparent head wound, and upon further examination he discovered that the victim had a laceration across her entire neck. The victim was air-lifted to Vanderbilt shortly thereafter. Mr. Hayes recalled seeing a hammer and a knife wrapped in a green towel in the living room of the victim's house.

The victim testified that she had grown up in the same town as Peden and had known him since childhood. She and Peden had been dating for just over a year at the time of the incident, and Peden had been living with her and her two daughters during that time. Peden had a key to the house and, while he did not have the code to disarm the alarm, he had a "keypad" that allowed him to turn off the alarm remotely. She testified that she owned a gray Ford Taurus before she started dating Peden, and they bought a white Mercury Sable when they began dating that was jointly titled in both of their

---

[1] It is the policy of this court to refer to minors by initials.

names.  She stated that she had a job during the time she lived with Peden but that he did not.  She allowed Peden to use her debit card "in the beginning," but took the card away from him after he abused it.

The victim also kept a diary, and testified that she "wrote in it about everything," including her relationship with Peden.  She usually kept the diary by her bed, and did not know why the police found it on the sofa in the living room.  She never showed Peden her diary, but she testified that he saw her writing in it frequently and that she had previously told him she was writing about him.  The last entry was dated September 19, 2012, and read as follows:

> I got [Peden] an interview with Virginia at Taco Bell . . . he came in but I only pray he gets the job.  I also had to go buy a lawnmower because my mama [sic] didn't want him to use the lawnmower I bought for her, so to keep down trouble, I got my own lawnmower to have at my house.  Well, it's 7:40 [p.m.] and [Peden] ain't here, his phone goes straight to voicemail.  I'm only praying my feelings are a lie.  [] I pray he ain't getting high.  I don't think I can just do this time if he gets out there, he made me a promise . . . that he was through.  I feel like a fool kind of, I will put him out this time and let him go and I do not want him to drag me down.

Later that night, Peden arrived at the house and took an iPad that belonged to the victim's two daughters.  After a brief verbal argument with the victim, Peden left in the white Mercury Sable.  The victim testified that she did not recall anything about the attack, and the last thing she remembered from the night of September 20, 2012, was going to bed with her youngest daughter before waking up at Vanderbilt. When asked about the hammer that was found in her living room, the victim stated that Peden kept one like it in the back of his car.  However she was unable to identify the knife recovered from the scene.

The victim was interviewed by police twice at the hospital, and she testified that she had no memory of either interview as a result of her injuries and subsequent stroke. During the first interview, which was played in court, she told Detective Barr that she was attacked by "Bubba Braden," an ex-boyfriend that she testified she had not seen in at least fifteen years.  On cross-examination, the victim confirmed that she had no memory of the second interview either, but had since listened to a recording of the interview and recognized her voice.  The victim confirmed that she told Detective Mike Bennett, the Metro Nashville officer that conducted the second interview,  that the biggest problem in her relationship with Peden was his drug use and that he had previously stolen her debit card and emptied her bank account "in order to get high."  She believed the last time she

saw her debit card was when she used it to withdraw money to buy the lawnmower on September 19, 2012, but she could not be certain.

Ramankit Kaur testified that he owned a convenience store in Ardmore, Tennessee, near the Tennessee-Alabama border. Mr. Kaur identified two receipts for purchases made at his store with the victim's debit card at 8:25 a.m. and 8:29 a.m. on September 20, 2012. Kaur confirmed that the signature on the receipt said "Donald." The receipts were for a six-pack of beer, a cigar, and cigarettes. Tony Dabbs, a fraud investigator with U.S. Bank, testified at trial that he had thirty-four years of experience in fraud investigations. He confirmed that the purchases made at Kaur's gas station on September 20, 2012, were debited from the victim's account via her debit card.

Trooper William Alvarez testified consistently with his testimony at the suppression hearing. He also noted that prior to having the vehicle towed, he conducted a "brief inventory" of the vehicle, but was unaware at the time that Peden was a suspect in an attempted homicide in Davidson County. The vehicle was subsequently towed from the scene to a private impound lot in Marshall County.

Officer Joe Williams, a member of the Technical Services Unit of the Metro Nashville Police Department testified that he arrived at the scene between 7:00 and 7:30 a.m. on September 20, 2012, but because Peden lived at the location, did not begin processing the scene until a search warrant was obtained. Upon entering, Officer Williams described the amount of blood on the scene as follows:

> There was blood on the couch, on the rug, and also there was like a plastic mat, clear mat like to walk on, that was full of feces and blood and it led up to the hallway, which was about fourteen feet at the most, but you turn the hall and you have blood on the wall, blood on the ground, and blood on the door.

Moreover, Officer Williams noted a knife with a blue cloth wrapped around the handle on the sofa in the living room next to a "two-pound sledgehammer". He collected both items as evidence. He noted that he did not see any signs of forced entry. On cross-examination, Officer Williams admitted that he did not collect any fingerprints on the scene, nor was he sure if any other officers had. He clarified that he wore protective gloves at all times he was collecting evidence, and changed to a new pair after handling each item of evidence to avoid cross contamination.

Officer Charles Linville, another member of the Technical Services Unit, assisted Officer Williams in processing the crime scene. Officer Linville was charged with obtaining measurements for a rough sketch of the residence, and he stated that he did not

collect any fingerprints or other evidence.  He also processed the victim's white Mercury Sable at the State impound lot in Davidson County.  His examination of the vehicle revealed four potential bloodstains and, after a positive presumptive test, Officer Linville cut out a portion of the front-passenger seat containing the stains.  He also took swabs from areas of the door and console that tested positive for blood, and sent them for further DNA processing.  He did not collect any fingerprints from the vehicle.  On cross-examination, Officer Linville clarified that he wore protective gear while examining the crime scene but could not recall if he just put on the rubber gloves or the "whole garb."

Dr. Shannon Eastham was among the doctors that treated the victim when she arrived at Vanderbilt.  She testified that when the victim arrived, she was categorized as "level one trauma," the most serious trauma category at Vanderbilt, and was taken immediately into surgery.  Once her condition was stable, she was taken for testing to determine the extent of her injuries, which Dr. Eastham described as life-threatening.

> She had a large laceration to the left side of her neck extending from behind the left ear all the way down almost to the front of her neck . . . she had a neck fracture as well [as a fracture of] her cervical seventh vertebrae on the left and then she also had evidence of some vascular…[occlusion], possible …[occlusion] of her…[carotid] arteries

A subsequent MRI revealed that the victim suffered a depressed skull fracture in the attack, resulting in intracranial bleeding as well as multiple orbital fractures around her right eye.  As a result of these head injuries, the victim suffered a stroke shortly after being admitted.  Dr. Eastham explained that many of these injuries were permanent, including the victim's loss of vision in her right eye.  In total, the victim remained in the hospital for eight days.

Detectives Weeks and Barr testified consistently with their testimony from the suppression hearing.  On cross-examination, Detective Weeks admitted that he did not take any fingerprints at the scene, and Detective Barr recalled that the victim appeared to be under the influence of drugs during the first interview.

Metro Police Officer Michael Bennett took over the investigation after it was determined that the victim would survive and the case was transferred to the domestic violence unit.  He arrived at the crime scene after the victim had already been transported to the hospital, at which time he was informed that the victim's white Mercury Sable was missing and that Detectives Weeks and Barr were traveling to Giles County to locate Peden.  Later that day, Officer Bennett was informed that Peden had been involved in a traffic accident in Giles County while driving a white Mercury Sable.

The following day, September 21, 2012, Officer Bennett traveled to Giles County and obtained a search warrant for Peden's DNA. In addition to Peden's DNA sample, he took the clothing and personal effects Peden had on him at the time of his arrest, including the victim's debit card. He later took a DNA sample from the victim and sent both samples, along with Peden's personal items, for DNA analysis. Because of the severity of the victim's injuries, Officer Bennett was not able to speak with her about the attack until September 24, 2012. On that day, the victim stated that she remembered going to bed with her youngest daughter and waking up when Peden came home sometime during the night. The next thing she recalled was waking up in the hospital with no recollection of the attack. In the audio recording of the interview, which was played for the jury, the victim is incoherent. Officer Bennett and hospital nurses are heard telling the victim to "wake up" on multiple occasions, and several times Officer Bennett is forced to ask the victim if she hears or understands him. When conscious, she tells Officer Bennett that she was attacked by "Bubba Braden," and claimed that Braden was living with her intermittently at the time of the attack. Officer Bennett interviewed the victim again on September 26, 2012, after she was released from the hospital, but she was unable to recall anything about the attack.

On cross-examination, Officer Bennett confirmed that Donald Peden was his only suspect at the time that he interviewed the victim and that, based on the September 24 interview, he was under the impression that Bubba Braden and Donald Peden were the same person. He additionally confirmed that he wore protective equipment each time he entered the crime scene.

Casey Koza, a forensic scientist with the Tennessee Bureau of Investigation (TBI), testified as an expert in serology and stated that she performed presumptive blood tests on items of evidence collected in Peden's case. Among the items tested were the socks collected from Peden while he was in jail, the sledgehammer and knife that were collected from the crime scene, Peden's sweatpants, shoes and t-shirt as well as the fabric swatches that were cut from inside the white Mercury Sable. Blood was detected on the hammer and the knife found at the scene, as well as Peden's shoes, shirt, and the fabric swatch cut from the front-passenger seat of the Mercury Sable. Agent Coza forwarded these findings to Mark Dunlap, a forensic scientist with the TBI, for a DNA comparison.

Agent Dunlap testified as an expert in serology and DNA analysis and stated that he compared the DNA samples from Peden and the victim to the samples provided to him from Agent Coza. His findings were included in an expert report that was admitted without objection. His examination revealed that the victim's DNA was present on the knife and sledgehammer found at the crime scene, Peden's socks, shirt and shoes, and the fabric swatches cut from the Mercury Sable. In sum, nine of the ten items tested

contained the victim's DNA. On cross-examination, Agent Dunlap admitted that a DNA profile was present on the hammer that did not match the victim or Peden. Additionally, there was a separate DNA profile contained on the knife that was inconclusive regarding Peden. He clarified that he was only provided with DNA samples from Peden and the victim and was not asked to conduct a comparison to any other DNA profiles in this case.

Elizabeth Reid, a forensic scientist for the TBI, testifying on behalf of the defense, stated that she analyzed the sledgehammer and knife recovered from the crime scene for the presence of fingerprints. She found partial prints on these items but neither print was sufficient for a comparison.

Testifying on his own behalf, Donald Peden denied attacking the victim. He described the morning of September 19, 2012, as "normal" and recalled that after he helped the victim get her two daughters to school, the victim gave him her debit card to buy a lawnmower for work. He testified that he went to a convenience store and bought gas for his vehicle, the lawnmower, and a 40-ounce beer before going to work. After work, he bought another beer and went to visit his friend "Red," where he bought "maybe a half gram of crack cocaine," and proceeded to drink and get high. At this point, he went and picked up the victim's daughters from school, dropped them off at their grandmother's house, and smoked the rest of the crack he had bought before going to a job interview at Taco Bell that the victim had arranged for him. When he finished the interview, he went home to retrieve an iPad that belonged to the victim's daughters, which he then traded for more crack cocaine. He returned to the house later that night to retrieve a laptop, which he traded for more crack cocaine. By the time he went home between 2:00 and 3:00 a.m., he had consumed "about a twelve pack" of beer in addition to the crack cocaine.

When he arrived at the victim's house, Peden testified that he saw "an older model car" parked in front of the house and Bubba Braden running out of the house. Peden claimed that he recognized Braden because they both grew up in Pulaski, Tennessee. When he entered the house, the victim was lying in the floor bleeding and nonresponsive. Peden claimed that he attempted to pick her up before panicking and running out of the house. He then went and bought more alcohol. He testified that he had never seen the sledgehammer found at the scene and did not call the police to report what he had seen because he did not want to implicate himself in the crime.

On cross-examination, Peden admitted that "it ha[d] been a while" since he had seen Braden before the early morning of September 20, 2012, but that he was able to clearly identify him running out of the house because Braden ran in front of his headlights as he pulled up to the house. He testified that the victim was not conscious or breathing when he attempted to pick her up and that he panicked and left because he was

high and drunk and "didn't know what to think." He claimed to have no memory of traveling to Alabama or stopping at two convenience stores to buy beer and cigarettes. Moreover, though he knew the victim kept a journal and wrote about him in it, he claimed he had never read it. Finally, Peden admitted that he never told anyone except for his attorney about seeing Braden at the scene on the morning of September 20, 2012. After deliberation, the jury convicted Peden of attempted first degree murder in count one and theft of property valued at less than $500 in count two.

**Sentencing Hearing.** At the sentencing hearing, the State argued that Peden was a career offender because he had been previously convicted of at least six Class C felonies. In support, the State introduced copies of the presentence report as well as certified copies of seven judgments reflecting seven Class C felony convictions. Because the certified judgment for one of those convictions, count two in case number 10446, did not include an offense date, the State introduced certified copies of the criminal information in that case, purporting to show the accurate offense date of October 17, 2001. Peden did not put on any proof at the sentencing hearing but disputed the State's assertion that he was a career offender. In sum, he argued that the trial court should determine the offense dates from the certified judgments rather than the criminal information. Regarding the blank offense date on count two in case number 10446, Peden argued that the trial court should presume that the offense date is April 7, 1998, because count three of the same case number lists an offense date of April 7, 1998. When analyzed this way, Peden claimed that three of the seven felony convictions the State was relying on were committed on April 7, 1998, and pursuant to the Twenty Four Hour Merger Rule, count as only a single conviction for the purpose of determining the sentencing range. See T.C.A. § 40-35-108(b)(4). This would leave Peden with only five Class C felony convictions and render him a persistent offender. See T.C.A. § 40-35-107(a)(1). The trial court agreed with the State and sentenced Peden to sixty years at sixty percent. The trial court explained its ruling as follows:

> Just for the record, [the] Court finds that in case 8054, Mr. Peden [pled guilty] to three counts of sale of cocaine, those sales having occurred on February 14th, March 8th and July 7th of 1995, so there's three C felonies. In case 7839 Mr. Peden pled guilty to an aggravated burglary that occurred on [August 30, 1995], again a C felony, and then [in case number] 10325 he pled guilty to a class C [felony] . . . on April 7th 1998. And in [case number] 10446, he pled guilty to another sale in count two [and] to another sale of less than half a gram of cocaine [in count three], and according to the certified criminal informations, since the date for [count three] was not put on the judgment form, [] the criminal information indicates it occurred on October 17th, 2001, again, that's a class C felony, that in and of itself is six separate and distinct class C felonies all of which would operate to have

-10-

establish[ed] him as a career offender, therefore, [regarding] count one, the attempt to commit premeditated first-degree murder [and] having been established as a career offender, Mr. Peden will be sentenced to 60 years at 60 percent.

Peden filed a motion for new trial on January 22, 2015, and the motion was denied after a hearing on June 24, 2015. This timely appeal follows.

## ANALYSIS

**I. Sufficiency of the Evidence.**[2] On appeal, Peden asserts two reasons that there is insufficient evidence to sustain his conviction for attempted first degree murder. First, he claims that the "State presented no evidence that would support the assertion that Mr. Peden acted with the premeditation required to support his conviction for Attempted First Degree Murder." Second, "the proof presented demonstrated that Mr. Peden was intoxicated at the time of the offense to the point that he could not have formed the requisite specific intent to commit the offense." The State responds that the evidence was sufficient for the jury to find that Peden acted with premeditation, and that the jury rightly rejected his assertion that he was too intoxicated to form the requisite intent because he claimed at trial that someone else committed the crime. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt."

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of

---

[2] For clarity, we have reordered the issues on appeal.

review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not substitute its inferences for those drawn by the trier of fact. Id.

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." Dorantes, 331 S.W.3d at 379 (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" Rice, 184 S.W.3d at 662 (quoting Marable, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011) (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Dorantes, 331 S.W.3d at 379 (quoting Hanson, 279 S.W.3d at 275).

As relevant here, a person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense, "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" T.C.A. § 39-12-101(a)(2). First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1). Premeditation is defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d). This section further defines premeditation:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id.

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Young, 196 S.W.3d 85, 108 (Tenn. 2006) (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)); State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Factors that may support the existence of premeditation include, but are not limited to: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, declarations by the defendant of an intent to kill, lack of provocation by the victim, failure to aid or assist the victim, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, calmness immediately after the killing, and destruction and secretion of evidence of the killing. State v. Kiser, 284 S.W.3d 227, 268 (Tenn. 2009); State v. Leach, 148 S.W.3d 42, 53-54 (Tenn. 2004); State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003); Bland, 958 S.W.2d at 660. In addition, a jury may infer premeditation from any planning activity by the defendant before the killing, from evidence concerning the defendant's motive, and from proof regarding the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted).

Peden argues that the State failed to introduce any proof demonstrating that he acted with premeditation. We disagree. As noted above, premeditation is a question of fact reserved for the jury, and the jury may infer premeditation from the facts and circumstances surrounding the case, including the use of a deadly weapon upon an unarmed victim and the use of multiple weapons in succession. Leach, 148 S.W.3d at 54 (citing State v. Bush, 942 S.W.3d 489, 501-502 (Tenn. 1997)). In this case, a knife and a small sledgehammer, both with bloodstains matching the victim's DNA profile, were discovered in the living room next to the victim's diary. The last entry of the diary, read to the jury at trial, was dated September 19, 2012, and reflected that the victim suspected Peden of using drugs and intended to end her relationship with Peden and ask him to move out. The victim testified that the diary "shouldn't have been [on the sofa]," and that she always kept the diary either in her nightstand or under her pillow. Under these circumstances, a jury could reasonably conclude that Peden arrived home after the victim and her daughters were asleep, got into a confrontation with the victim, and attempted to kill her using both the knife and the sledgehammer. Believing he had accomplished his task, he left in the victim's white Mercury Sable before getting into an accident, at which point he was arrested wearing a shirt, socks, and shoes that were all stained with the victim's blood. Viewed in the light most favorable to the State, there was sufficient evidence for the jury to infer that Peden acted with premeditation from the use of a deadly weapon on an unarmed victim, the use of multiple deadly weapons in succession, the infliction of multiple wounds, and evidence of Peden's motive as reflected in the diary entry.

-13-

Peden additionally argues that he was unable to form the culpable mental state required for attempted first degree murder due to his level of intoxication. Although not a defense to prosecution, voluntary intoxication "is admissible in evidence, if it is relevant to negate a culpable mental state." T.C.A. § 39-11-503(a); see Wiley v. State, 183 S.W.3d 317, 333 (Tenn. 2006) ("Evidence of a defendant's intoxication is relevant to negate a culpable mental state of a charged offense."). "Proof of voluntary intoxication is therefore akin to proof of a mental disease or defect that prevents a defendant from forming the culpable mental state required for the offense under consideration." State v. Hatcher, 310 S.W.3d 788, 814 (Tenn. 2010). However, "[p]roof of intoxication alone is not a defense to a charge of committing a specific intent crime nor does it entitle an accused to jury instructions as requested . . . ; there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent." Harrell v. State, 593 S.W.2d 664, 672 (Tenn. Crim. App. 1979). The weight given to evidence of voluntary intoxication and the determination of whether the voluntary intoxication negated the culpable mental state are matters resolved by the jury. State v. Morris, 24 S.W.3d 788, 796 (Tenn. 2000).

The record shows that the jury was instructed on voluntary intoxication at trial. Although Peden claims that his voluntary intoxication negated the specific intent required for the attempted first degree murder conviction, the jury rejected this claim as is their prerogative. This is understandable in light of the fact that Peden's defense at trial was that someone else attacked the victim and that he only arrived home after the attack. Moreover, although Peden testified extensively regarding his drug and alcohol use on the night of the offense, he presented no evidence that the intoxication deprived him of the mental capacity necessary to form specific intent. Additionally, Peden was able to succinctly recall details about the amount of drugs and alcohol he consumed, precisely when and with whom he consumed them, and his exact travel route home after his drug use ended, including which specific roads he took and which landmarks he passed. Based on the proof presented at trial, we conclude that there is sufficient evidence to sustain Peden's conviction beyond a reasonable doubt.

**II. Fourth Amendment Violation.** Peden claims that the trial court should have suppressed evidence taken from the white Mercury Sable because the vehicle was illegally seized when it was towed from the impound lot in Marshall County to the police impound lot in Davidson County. Relying on State v. Saine, 297 S.W.3d 199, 207 (Tenn. 2009), the State asserts that they were justified in towing the vehicle pursuant to the automobile exception to the warrant requirement. Importantly, Peden does not challenge the search of the vehicle, which was conducted pursuant to a warrant, but rather the transportation of the vehicle from the impound lot in Marshall County to the police impound lot in Davidson County.

When evaluating a trial court's ruling on a motion to suppress, this court may consider the proof presented at both the suppression hearing and at trial. State v. Williamson, 368 S.W.3d 468, 473 (Tenn. 2012) (citing State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998)). "A trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Williams, 185 S.W.3d 311, 314 (Tenn. 2006) (citing State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). The Tennessee Supreme Court explained this standard:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Odom, 928 S.W.2d at 23. However, this court's review of a trial court's application of the law to the facts is de novo. State v. Day, 263 S.W.3d 891, 900 (Tenn. 2008) (citing Williams, 185 S.W.3d at 315; State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). The defendant bears the burden of showing that the evidence preponderates against the trial court's findings. Odom, 928 S.W.2d at 23.

The Fourth Amendment to the United States Constitution and Article 1, Section 7 of the Tennessee Constitution protect against unreasonable searches and seizures. "[U]nder both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." Yeargan, 958 S.W.2d at 629 (citing Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); State v. Bartram, 925 S.W.2d 227, 229-30 (Tenn. 1996)). One such exception is the automobile exception, which the Tennessee Supreme Court most recently addressed in State v. Saine, 297 S.W.3d 199, 207 (Tenn. 2009):

> The "automobile exception" to the warrant requirement permits an officer to search an automobile if the officer has probable cause to believe that the automobile contains contraband. Carroll v. United States, 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The rationale for the automobile exception is two-fold. Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996); California v. Carney, 471 U.S. 386, 392–93, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985). First, it is often

-15-

impractical for officers to obtain search warrants in light of the inherent mobility of automobiles. Carney, 471 U.S. at 393. Second, individuals have a reduced expectation of privacy in their automobiles. Id.

Additionally, the Tennessee Supreme Court affirmed that Tennessee "has consistently followed United States Supreme Court decisions involving the automobile exception," and recognized that "the automobile exception does not require a separate finding of exigency under the Tennessee Constitution." Saine, 297 S.W.3d at 207. Probable cause, without more, is sufficient to justify the search of an automobile. Id.; see also State v. John Burley Alberts, No. M2015-00248-CCA-R3-CD, 2016 WL 349913, at * 6 (Tenn. Crim. App. Jan. 28, 2016) (rejecting the defense's contention that the application of the automobile exception depends on the mobility of the specific vehicle in question); State v. Carrie Lynn Ronewickz, No. W2011-01332-CCA-R3-CD, 2012 WL 6719646, at *20 (Tenn. Crim. App. Dec. 26, 2012), perm. app denied (Tenn. May 14, 2013) (concluding that, pursuant to the automobile exception, once the officer had probable cause to believe that the defendant's vehicle contained contraband, "the officer was free to search the van immediately or have it towed and searched later[.]"); State v. Jose Roberto Ortiz, No. M1998-00483-CCA-R3-CD, 1999 WL 1295988, at *15 (Tenn. Crim. App. Dec. 30, 1999), perm. app. denied (Tenn. Sept. 25, 2000) (noting that the United States Supreme Court "explicitly rejected the notion that, in addition to probable cause, exigent circumstances other than the inherent mobility of an automobile must be present in order to justify a warrantless search of the vehicle.") (citing LaBron, 518 U.S. at 940). Accordingly, when an officer has probable cause to believe that evidence of a crime is contained within a vehicle, the officer has the option to seize the vehicle and obtain a warrant for its search, or search the vehicle immediately. Chambers v. Maroney, 399 U.S. 42, 52 (1975).

In this case, the search of the vehicle was proper because the officers had probable cause to believe that evidence related to the victim's attack would be found in the vehicle. Detective Weeks testified that he observed a "significant amount of blood" at the crime scene as well as bloody foot tracks along the carpet leading to the front door. After speaking with the victim's daughters, Detectives Weeks learned that a white Mercury Sable was missing from the house and shortly thereafter was informed that Peden had been in an accident that morning in a white Mercury Sable and was currently being held in the Giles County jail. Detective Weeks and Barr both testified that upon entering the jail cell to interview Peden, the first thing they noticed was the blood on the bottom of his sock. Accordingly, there was probable cause to believe that more blood or other evidence would be found in the vehicle and this, without more, rendered the warrantless seizure of the vehicle constitutionally sound. Peden is not entitled to relief on this issue.

**III. Fifth Amendment Violations.** Peden also claims that his Fifth Amendment rights under the United States Constitution were violated when Detectives Weeks and Barr collected his socks and photographed his hands after he invoked his Miranda rights. The State responds that the trial court correctly denied Peden's motion in limine because the detectives observed the blood stains on Peden's hands and socks prior to Peden invoking his Miranda rights. Moreover, the State asserts that the invocation of Miranda "does not preclude the State from collecting incriminating evidence which the defendant may have in his possession which has already been discovered by the police." We agree with the State.

The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, the Tennessee Constitution states "that in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "Encompassed within both of these constitutional provisions is the right to counsel, which is applicable whenever a suspect requests that counsel be present during police-initiated custodial interrogation." State v. Saylor, 117 S.W.3d 239, 244 (Tenn. 2003).

In Miranda v. Arizona, the United States Supreme Court generally stated that the right to counsel is invoked when an individual "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking . . . ." 384 U.S. at 444-45. However, eight years later in Davis v. United States, the United States Supreme Court adopted a significantly narrower standard for invoking a right to counsel under the Fifth Amendment when it held that "[i]nvocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" 512 U.S. 452, 458-59 (1994) (quoting McNeil v. Wisconsin, 501 U.S. 171, 178 (1991)).

Whenever a suspect invokes his right to counsel, law enforcement must stop questioning until the suspect's attorney is present. Saylor, 117 S.W.3d at 244 (citing Miranda, 384 U.S. at 444-45; Edwards, 451 U.S. at 484-85; State v. Stephenson, 878 S.W.2d 530, 548 (Tenn. 1994)). An invocation of the right to counsel may be made "in any manner and at any stage of the process[.]" Miranda, 384 U.S. at 444-45. Once the suspect invokes his right to counsel, any later statement made by a defendant as a consequence of interrogation by police must be suppressed. Edwards, 451 U.S. at 487. In addition, once the right to counsel attaches, only the suspect can initiate further communication with law enforcement. Id. at 484-85. Any waiver of Miranda rights must be "made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444. A court must examine the totality of the circumstances in determining whether a defendant has validly waived his Miranda rights. State v. Climer, 400 S.W.3d 537, 564 (Tenn. 2013).

-17-

In this case, the trial court determined that the evidence in question was properly admissible because it was not the product of any coercive tactics on the part of the State. In so finding, the court reasoned:

> In the instant case, the Defendant's Fifth Amendment rights under the United States Constitution and rights provided under [the Tennessee Constitution] were not violated. Detectives Weeks and Barr began their interrogation of the Defendant by adequately informing the Defendant of his Miranda rights. Then, after a short period of questioning in which the Defendant was largely unresponsive, the Defendant asserted his right to an attorney and stated that he did not want to speak to the detectives anymore.

> Upon the Defendant's request for counsel detectives Weeks and Barr ended their questioning of the Defendant. It was at this point in their interaction with the Defendant that they began to document non-testimonial evidence that was apparent to them upon initially entering the jail cell. Consequently, none of the non-testimonial evidence collected and documented by detectives Weeks and Barr was the product of testimonial evidence received in violation of the Defendant's Miranda rights.

Upon review, we conclude that the trial court properly denied Peden's motion in limine. The record supports the finding that the challenged evidence was not the product of a coerced statement from Peden. At the suppression hearing, both Detectives Weeks and Barr testified consistently that they observed the blood on the bottom of Peden's sock and on his thumb soon after entering the jail cell and well before Peden's invocation of his Miranda rights. The trial court credited this testimony in finding that the evidence in question was discovered through the plain view observations of both detectives and was not the product of a statement from Peden, coerced or otherwise. Moreover, in the audio recording of the interview, Detective Weeks mentions the blood on Peden's sock within the first two minutes of the interview, after Peden was advised of his Miranda rights but well before he requested an attorney. These facts support the trial court's determination that the disputed items of evidence were not obtained by coercion. The Tennessee Supreme Court has held that physical, non-testimonial evidence that is "not the product of actual coercion or other efforts designed to overcome [the defendant's] will," need not be suppressed. See State v. Walton, 41 S.W. 3d 75, 92 (Tenn. 2001) (non-testimonial evidence should be suppressed "only when the statements [leading to the evidence] are the product of an actual violation of the privilege against self-incrimination, i.e., such as when actual coercion in obtaining the statement is involved or when the invocation of the right to remain silent or to have counsel present is not 'scrupulously honored.'"). Accordingly, Peden is not entitled to relief on this issue.

**IV. Sixth Amendment Violation.** Peden also argues that his Sixth Amendment rights were violated by the collection of his sock and the photographs of his hands taken while he was incarcerated in Giles County. The State responds that the issue is meritless because Peden's Sixth Amendment rights had not yet attached when the evidence was collected. We agree with the State.

Unlike the Fifth Amendment, the Sixth Amendment ensures that "in all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. In Tennessee, the Sixth Amendment right to counsel attaches when adversary judicial proceedings are initiated. State v. Frazier, 814 S.W.2d 467, 469 (Tenn. 1996) (citing State v. Mitchell, 593 S.W.2d 280, 286 (Tenn. 1980)). "'Initiation is marked by formal charge, which we construe to be an arrest warrant, or at the time of the preliminary hearing in those rare cases where a preliminary hearing is not preceded by an arrest warrant, or by indictment or presentment when the charge is initiated by the Grand Jury.'" Id. (quoting Frazier, 814 S.W.2d at 469).

In Montejo v. Louisiana, the United States Supreme Court overruled Michigan v. Jackson, 475 U.S. 625 (1986), which prevented law enforcement from initiating an interrogation of a defendant after the defendant had requested counsel at an arraignment or similar hearing and concluded that the purpose of the Jackson rule was met by the protections given by Miranda v. Arizona, 384 U.S. 436 (1966), Edwards v. Arizona, 451 U.S. 477 (1981), and Minnick v. Mississippi, 498 U.S. 146 (1990):

> These three layers of prophylaxis are sufficient. Under the Miranda-Edwards-Minnick line of cases (which is not in doubt), a defendant who does not want to speak to the police without counsel present need only say as much when he is first approached and given the Miranda warnings. At that point, not only must the immediate contact end, but "badgering" by later requests is prohibited. If that regime suffices to protect the integrity of "a suspect's voluntary choice not to speak outside his lawyer's presence" before his arraignment, Cobb, 532 U.S. at 175, 121 S. Ct. 1335 (Kennedy, J., concurring), it is hard to see why it would not also suffice to protect that same choice after arraignment, when Sixth Amendment rights have attached.

Montejo v. Louisiana, 556 U.S. 778, 794-95 (2009). "Under our precedents, once the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all "critical" stages of the criminal proceedings." Montejo, 556 U.S. at 786 (citing United States v. Wade, 388 U.S. 218, 227-228 (1967); Powell v. Alabama, 287 U.S. 45, 57 (1932)). Interrogation by the State is considered a "critical" stage of the criminal proceedings. Id. (citing Massiah v. United

States, 377 U.S. 201, 204-205 (1964); United States v. Henry, 447 U.S. 264, 274 (1980)). Sepulveda v. State reiterated the limited scope of the Sixth Amendment:

> "The Sixth Amendment right . . . is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings-whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."

90 S.W.3d 633, 638 (Tenn. 2002) (quoting McNeil v. Wisconsin, 501 U.S. 171, 175 (1991) (internal quotations omitted)).

As noted above, the Sixth Amendment right to counsel attaches after the initiation of an adversary judicial criminal proceeding against a defendant. Here, Peden had not yet been arrested or charged in relation to the present case; thus, his Sixth Amendment right to counsel had not yet attached. Significantly, we note that the Sixth Amendment is offense specific. Id. Accordingly, although Peden's Sixth Amendment right to counsel had attached with regard to the DUI for which he was incarcerated, this right had not yet attached with regard to the attempted murder that Detectives Weeks and Barr were investigating. See Texas v. Cobb, 532 U.S. 162, 172-73 (2001) (holding that the Sixth Amendment right to counsel on charged offenses does not prevent law enforcement from interrogating a defendant regarding other uncharged offenses). Peden is not entitled to relief on this issue.

**V. Career Offender Status.** Finally, Peden claims that the trial court erred by sentencing him as a career offender. Specifically, he claims that the State's notice of intent to seek enhanced punishment was insufficient because it failed to comply with Tennessee Code section 40-35-202(a). Second, Peden claims that the trial court erred in determining that he was a career offender based on the proof presented at the sentencing hearing. The State concedes that the offense dates are listed incorrectly on the initial notice to seek enhanced punishment, but asserts that the error was remedied by the amended notice, and Peden suffered no prejudice as a result. Lastly, the State argues that the trial court properly determined that Peden was a career offender based on the proof presented at the sentencing hearing.

The 2005 amendments to the Sentencing Act "served to increase the discretionary authority of trial courts in sentencing." State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In light of this broader discretion, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." Id. at 706. Pursuant to Bise, this court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review,

-20-

granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

Tennessee Code Annotated section 40-35-202(a) provides that if the State believes that a defendant's sentence should be enhanced, it "shall file a statement thereof with the court and defense counsel not less than ten (10) days before trial or acceptance of a guilty plea." T.C.A. § 40-35-202(a); see also Tenn. R. Crim. P. 12.3(a) ("Written statements of the district attorney giving notice that the defendant should be sentenced to an enhanced punishment . . . shall be filed not less than ten (10) days prior to trial. If the notice is filed later than this time, the trial judge shall grant the defendant, upon motion, a reasonable continuance of the trial."). This statement "must set forth the nature of the prior felony convictions, the dates of the convictions and the identity of the courts of the convictions." Id. The purpose of the statement is to provide notice to a defendant that he is exposed to enhanced sentencing beyond the standard range, to encourage plea bargain agreements, to help the defendant make an educated decision before entering a plea of guilt, and to assist with trial strategy. State v. Livingston, 197 S.W.3d 710, 712 (Tenn. 2006) (citing State v. Adams, 788 S.W.2d 557, 559 (Tenn. 1990); State v. Taylor, 63 S.W.3d 400, 412 (Tenn. Crim. App. 2001)).

Regarding the accuracy of the information on the notice of intent, the Tennessee Supreme Court has stated: "When a detail of the required information is omitted or incorrect, the inquiry should be whether the notice was materially misleading. Where an ambiguity or contradiction appears on the face of the notice, defendant has a duty to inquire further." Adams, 788 S.W.2d at 558. "While 'perfect' notice is not required . . . [The Tennessee Supreme court has stated] that some notice meeting the minimal requirements of the statute be given." Livingston, 197 S.W.3d at 713. At a minimum, the statute requires that the State file: "(1) written notice, (2) clearly expressing the State's intention to seek sentencing outside of the standard offender range, (3) setting forth the nature of the prior felony conviction, the dates of the convictions, and the identity of the courts of the convictions." Id. at 713-14 (internal footnote omitted).

"The district attorney has the discretion to seek enhanced sentencing, and it is the district attorney's responsibility to provide notice to the court and the defendant pursuant to statute." State v. Carter, 121 S.W.3d 579, 584 (citing Adams, 788 S.W.2d at 559). In situations where the notice is filed late or the notice is filed on time but is defective, "the defendant must show prejudice before the notice will be rendered ineffective." Carter, 121 S.W.3d at 585 (citing State v. Stephenson, 752 S.W.2d 80, 81 (Tenn. 1988); State v. Debro, 787 S.W.2d 932, 933-34 (Tenn. Crim. App. 1989)).

We conclude that the State substantially complied with the notice requirements of section 40-35-202(a). The initial notice of enhancement was filed on April 19, 2013, well in advance of Peden's November 3, 2014 trial in this case, and stated explicitly that the State intended to have Peden's sentence enhanced. After the trial, on November 25, 2014, the State filed an amended notice correcting the errors in the offense dates listed in the previous notice. Significantly, the State did not add any additional convictions to the amended notice that were not contained in the original notice. The original notice conformed with the minimal requirements listed by the Supreme Court in Livingston because it was written, clearly expressed the State's intent to seek a punishment beyond the standard offender range, and set forth a list of prior convictions the State would be relying on, the dates of those convictions, and the court from which the convictions derived. Livingston, 197 S.W.3d at 713-14.

Furthermore, the fact that the notice did not specify the range within which the State sought to have Peden sentenced does not render the notice ineffective. Adams, 788 S.W.3d at 559 ("The purpose of subsection (a) is to provide fair notice to an accused that he is exposed to something other than standard sentencing."); Taylor, 63 S.W.3d at 412 (finding notice which stated that the State intended to seek an enhanced punishment but failed to specify a particular sentencing range substantially complied with subsection (a)). Similarly, the fact that the amended notice was untimely does not render it ineffective absent a showing of prejudice to the defendant. See Stephenson, 752 S.W.2d at 81 (holding that an untimely notice was not ineffective without a showing of prejudice on the part of the accused); State v. Chad M. Nicol, No. M2014-01474-CCA-R3-CD, 2015 WL 4238921, at *4 (Tenn. Crim. App. July 14, 2015), perm. app. denied (Tenn. Oct. 16, 2015) (holding that the State's notice was valid despite being filed after the defendant's guilty plea and ten days prior to the sentencing hearing). Peden was clearly aware from the April 19, 2013 notice that the State sought to have him sentenced as a career offender, and any assertion that he was unaware of the specific range is dispelled by the record in this case, which reflects that the trial court, the State, and defense counsel discussed whether Peden was a career offender at length at the conclusion of trial prior to setting a date for the sentencing hearing. This discussion occurred on November 5, 2014, more than two months prior to the sentencing hearing in this case. Accordingly, Peden received fair notice that he was exposed to a sentence beyond the standard range, and he is not entitled to relief on this issue.

Next we address whether the trial court properly determined that Peden was a career offender. As relevant here, a defendant qualifies as a career offender if that defendant has received six or more Class A, B, or C felonies and the conviction for which the defendant is being sentenced is also a Class A, B, or C felony. T.C.A. § 40-35-108(a)(1). However, with some exceptions not applicable here, convictions for multiple felonies committed within the same twenty-four hour period constitute one conviction for

purposes of determining prior convictions. Id. § 40-35-108(b)(5). "Where the defendant seeks the application of the twenty-four hour rule and the relevant convictions occurred on different days, it is the defendant's responsibility to demonstrate that the two offenses occurred within twenty-four hours of each other." State v. John Roy Polly, No. M1999-00278-CCA-R3-CD, 2000 WL 1606586, at *3 (Tenn. Crim. App. Oct. 27, 2000). If the trial court finds beyond a reasonable doubt that the defendant is a career offender, the court must impose the maximum sentence within the applicable Range III. T.C.A. § 40-35-108(c). The maximum sentence in the range for a career offender committing a Class A felony is sixty years served at sixty percent. Id. §40-35-112(c)(1).

Here, counts one, two, and three in case number 8054, and count one in case number 7839 were properly considered by the trial court for the purpose of determining Peden's sentencing range. Regarding count two in case number 10446, the only proof in the record of the offense date derives from the certified criminal information, which reflects an offense date of October 17, 2001. Although Peden disputes this date and argued at the sentencing hearing that the proper date was April 7, 1998, he offered no proof at the hearing supporting this assertion and there is nothing in the record to suggest that the offense date is anything other than October 17, 2001.[3] See State v. Ralph Byrd Cooper, No. E2012-01023-CCA-R3-CD, 2013 WL 3833412, at *3 (Tenn. Crim. App. July 22, 2013), perm. app. denied (Tenn. Nov. 14, 2013) (determining offense date from charging instrument in absence of other proof in the record). The fact that count three of the same indictment reflected an offense date of April 7, 1998 is irrelevant to the determination of the offense date on count two. See State v. Travis E. Birchfield, No.03-C-9701-CR00025, 1998 WL 2489, at *2 (Tenn. Crim. App., at Knoxville, Jan. 6, 1997) ("The fact that the three offenses were contained as separate counts in the same indictment is irrelevant to the [determination of the offense dates]."). In this case, the trial court determined the offense date for count two of case number 10446 from the certified criminal information, and found that the failure to list the offense date on the certified judgment was a clerical error. There is no proof in the record that preponderates against that finding. Accordingly, we hold that the trial court properly determined that Peden was a career offender based on the following convictions:

---

[3] The trial court determined that the offense date for both Counts 2 and 3 in case number 10446 was 10/17/2001 pursuant to the certified criminal informations in that case. In light of the fact that the record contains a certified judgment for Count 3 in that case that includes an offense date of 4/7/1998, we decline to determine the offense date from the certified criminal information for Count 3. Moreover, whether the offense date is 4/7/1998 or 10/17/2001 makes no difference in this case. In any event, Count 3 in case number 10446 will either merge with Count 2 of the same case number or Count 2 of case number 10325, leaving Peden with at least six Class C felony convictions.

-23-

| Offense | Offense Date | Case Number | Offense Count | Offense Type |
|---|---|---|---|---|
| Sale of Cocaine | 2/14/1995 | 8054 | 1 | C Felony |
| Sale of Cocaine | 3/08/1995 | 8054 | 2 | C Felony |
| Sale of Cocaine | 7/07/1995 | 8054 | 3 | C Felony |
| Aggravated Burglary | 8/30/1995 | 7839 | 1 | C Felony |
| Possession of less than .5 gram of cocaine | 4/7/1998 | 10325 | 2 | C Felony |
| Possession of less than .5 gram of cocaine | 10/17/2001 | 10446 | 2 | C Felony |
| Possession of less than .5 gram of cocaine | 4/7/1998 | 10446 | 3 | C Felony |

Having determined that Peden had previously committed at least six Class C felony offenses, his sentence of sixty years to be served at sixty percent was mandatory. T.C.A. § 40-35-108(c); T.C.A. § 40-35-112(c)(1). Peden is not entitled to relief.

## CONCLUSION

Based on the aforementioned authorities and reasoning, the judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE